**TEXAS & N. O. R. CO. v. STERLING et al.**
**No. 3898.**

Court of Civil Appeals of Texas. Beaumont.
Oct. 16, 1941.

Rehearing Denied Oct. 23, 1941.

Baker, Botts, Andrews & Wharton, of Houston, Llewellyn & Dougharty, of Liberty, and C. T. Duff, Louis V. Nelson, and Robert H. Park, all of Beaumont, for appellant.

Price Daniel and Bill Daniel, both of Liberty, for appellees.

WALKER, Chief Justice.

On the 30th day of January, 1938, about 3:45 a. m., at the Main street crossing on appellant's railroad in the city of Liberty, Ernest Sterling, his automobile stalled on the crossing, was struck by one of appellant's freight trains and killed. Ernest Sterling left surviving him his widow, Edmonia Sterling, and three minor children born to his marriage with Edmonia, and his father and mother. This was an action by appellees, the named survivors of Ernest Sterling, against appellant, Texas & New Orleans Railroad Company, for the damages suffered by them by reason of his death. On the trial, the jury found that appellant's train was being operated over the crossing at a high and dangerous rate of speed and without proper braking power, and that each of these acts was negligence and a proximate cause of the death of Ernest Sterling. The jury acquitted the deceased of contributory negligence, found in favor of appellees on the issue of unavoidable accident, and against them on the issue of discovered peril. Judgment was in favor of appellees for $3,960, the amount of the damages assessed by the jury.

Appellant contends on two counts that the deceased was guilty of contributory negligence as a matter of law. (1) It was established beyond controversy that Ernest Sterling's automobile was "stopped or

stalled" on appellant's railroad track in front of "the oncoming train"; appellant contends that there was no evidence excusing him of negligence in stopping or stalling his automobile in front of the train, and that there was no evidence, excusing him of negligence, explaining his presence in the automobile at the time it was struck by appellant's train. The evidence denies this contention. On this issue, Felicia Sterling, a passenger in the automobile with the deceased, testified: "I was sitting in the back of the car. Before he came to the railroad track, he slowed the car down. * * * He was going about five miles per hour. * * * Before going on the railroad crossing, he looked in both directions. I know because I was looking at him, I looked for the crossing. * * * The wigwag was not working. * * * I heard no warning whatever of a train coming. The first thing I knew the train was coming was when I seen the light, and that was after the car was stopped on the railroad track. The car just stopped all at once and stopped on the railroad track. After he had slowed down and was running toward the railroad track, it sputtered and stopped. It was after it stopped when I saw the light. * * Ernest Sterling pushed at her door. * * Lorena was sitting in front. * * * he pushed at her door and hallowed at me in the back to get out and she got out too. As he started to get out, the train hit all at once. The last thing I know he was doing was trying to get out himself. * * Immediately following the time that he slowed up, the car sputtered or something like that, and then just stopped. I first saw the train, or the light of the train, when we was on the railroad track * * * when I got out. I got about 15 feet away from the car. * * * Just the time we got out the train hit the car. He didn't have time to get out. The train hit the car."

Lorena Dickler, also a passenger in the automobile, testified: "As he slowed down there to go across that railroad crossing the car just stopped there. I don't know if the engine kept on running or not. The car stalled, just stopped right there. This is the first I knew the train was coming, when I seen the light flash on me. Just so fast, done altogether (witness illustrates by snapping fingers). * * * When the car stopped and we saw the light, Ernest reached for the little girl and hit my door and I jumped out. He got my door open. The right hand side on which I was sitting. The last thing I know of him doing was

when I looked back, when the train picked him up, his door was open. The front door on the left-hand side. I got outside the car before the collision, oh, just not far, but just about the front door when it happened. I didn't have time. Just had time to get out of the car."

On the following authorities the testimony of appellees' witnesses made the issue of contributory negligence one of fact and not of law. Texas & P. Ry. Co. v. Henry, Tex.Civ.App., 56 S.W.2d 904; Kirksey v. Southern Traction Co., 110 Tex. 190, 217 S.W. 139; Mitchum v. Chicago, R. I. & G. Ry. Co., 107 Tex. 34, 173 S.W. 878, 879; Gulf, C. & S. F. v. Shieder, 88 Tex. 152, 30 S.W. 902, 28 L.R.A. 838.

■ (2) Appellant's second point is that the deceased, as a matter of law, was guilty of negligence in driving upon the railroad track in front of the approaching train. The evidence denies this contention. Appellant's train approached the crossing without blowing the whistle or ringing the bell. As he approached the crossing, the view between him and the approaching train was obstructed by used cars parked along the lot down the railroad right-of-way, and by trees, telephone poles, and a house and a garage. The evidence raised the issue that he looked both ways and slowed down his automobile before attempting to cross appellant's tracks.

■ The evidence clearly raised the issue that at the time of the collision appellant's train was being operated without proper braking power. Appellant's train consisted of an engine and eighty five freight cars, sixty three were loaded and twenty two were empty. Before reaching San Jacinto street, the first city street on its running through the city traveling from Beaumont to Houston, the evidence raised the issue that the train was traveling over fifty miles per hour. Before crossing San Jacinto street, the engineer released his brakes to reduce his speed to thirty miles per hour. As the engineer was crossing San Jacinto street, he saw the car of the deceased on the crossing at Main street; Main street is 833 feet from San Jacinto street. On the evidence, the engineer was unable to stop or slow the train or reduce the speed of his train within the 833 feet between San Jacinto street and Main street; after striking the car of the deceased, the train went beyond Main street 3,083.2 feet before stopping. Appellant's train, after crossing Main street, crossed five crossings before stop-

968

ping. The train traveled from San Jacinto street to the place where it stopped after all the available brake power had been exhausted. The fireman, Mr. R. A. Lute, testified: "When we crossed over San Jacinto street we was making about thirty (30) miles an hour, and he had applied the brakes and reduced the speed of the train and had released the brakes when he crossed the crossing. He had released the brake valves and they had to be recharged before you could put them back on. * * * and then we seen the car made no effort to move and he immediately applied the emergency brakes but they didn't get no emergency application on account of the brakes not having fully recharged. He put on the brakes just before he got to San Jacinto street and had released them and had not built back up enough pressure and didn't have full braking ability at the time he went to stop for the Main street crossing. It is impossible to get emergency application. There is nothing else on a locomotive to stop it if the brake pressure is already gone."

The engineer, Mr. Wheeler, testified: "I couldn't have stopped it after I saw that nigger for no consideration in the world. The brakes had not recharged and I had no emergency pressure after I released the brakes because they had not recharged. I would have slowed down to a slower speed if I could have to keep from hitting the nigger, but I couldn't have done it. * * * That train on that night could not have been stopped after I put on the brakes before I got to the San Jacinto street crossing, I mean after I passed the San Jacinto street crossing and before I got to the Main street crossing. * * * And when I got to the old water tank then I went to the emergency, but I had no emergency. * * * No sir, as far as safety was concerned, that was not too heavy and too long a train to be operated through there, because I had my train under full control when I hit this nigger; of course after the negro showed up then I had done released my brakes and I went to the emergency but what good did it do, the negro was just in the wrong place."

■ Since the judgment has adequate support in the issue of negligence in operating the train without sufficient braking power, we pretermit a discussion of the assignments against the findings of the jury on the issue of operating the train at a dangerous rate of speed; however, we have carefully reviewed these assignments and overrule them as without merit.

■ The allegations of negligence in operating the train without proper braking power, at a dangerous and reckless rate of speed, and that appellant's servants were not keeping a proper lookout, were not inconsistent with the allegation of discovered peril; appellant's point is that the inconsistency between these allegations rendered appellees' petition bad on general demurrer.

■ We overrule appellant's contention that the following argument by appellees' counsel was on testimony "not in the evidence": "I don't know the exact testimony of the operator when asked about whether or not a reckless rate of speed he was coming, but as I remember it he did say that they didn't have braking power sufficient to stop the train of the weight and length that that one was with that engine. I believe he stated that when he got down there and finally stopped, there had to be some repair made on the brakes when he got there, and that he repaired one of them before breaking the train into two different and distinct trains and carried it on to and up the Dayton Hill."

The testimony quoted above supports the first part of the argument. The following additional testimony by the engineer supports the last part of the argument: "I worked on the engine and blowed off the cylinder cocks. I tried to repair them while I waited there. I got one of them repaired all right. When I got them repaired, I went on to Dayton."

■ Appellant's last point is that there was no testimony raising the issue that the minor plaintiffs had a right to expect contributions from their father after they reached their majority. This contention is overruled. Ernest Sterling was an honest, hard working negro at the time of his death, making $18 per week, had been holding that job more than five years; though separated from his wife and living in adultery with another woman, he paid her $20 per month for her support and the support of his minor children, and he was kind to his children and gladly helped them; he visited them regularly, and gave them care and attention. This testimony raised the issue that the amount of recovery of the minors was not limited to what they might have received from their father during their minority. Houston Gas & Fuel Co. v. Perry, Tex.Civ.App., 55 S.W. 2d 901, affirmed by Supreme Court, 127 Tex. 102, 91 S.W.2d 1052.

The judgment of the lower court is in all things affirmed.